



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/21/2022

**THE CITY OF NEW YORK**

**GEORGIA M. PESTANA**
*Corporation Counsel*

**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NEW YORK 10007

**MORGAN C. MCKINNEY**
*Senior Counsel*
E-mail: mmckinne@law.nyc.gov
Phone: (212) 356-2012

January 20, 2022

**BY ECF**
Judge Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:   Glen Carwell v. City of New York, et al., 21-CV-00480 (VEC)

Your Honor:

I am the Senior Counsel in the Office of Georgia M. Pestana, Corporation Counsel of the City of New York, representing defendants the City of New York and Detective Carlos Lozada in the above-referenced matter (hereinafter "defendants.") For the reasons set forth herein, defendants respectfully request that the Court endorse defendants' proposed briefing schedule for defendants' anticipated motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and issue a stay of the limited discovery remaining in this matter, pending the resolution of the motion.

A.   Procedural Posture of the Case

Plaintiff failed to appear for his noticed deposition in this matter on January 18, 2022[1] and fact discovery is currently scheduled to close today, January 20, 2022. (See Case Management Plan, at ¶5(a), Civil Dkt. No. 22, filed October 18, 2021, attached as Exhibit "A").

On January 18, 2022, despite several follow up emails, neither plaintiff nor his counsel appeared virtually for plaintiff's noticed deposition. Defendants eventually spoke with one of plaintiff's counsels, Sameer Nath, Esq., who informed defendants, for the first time, that plaintiff was unable to appear at his deposition because Mr. Samuel DePaola, plaintiff's other attorney,

---

[1] Defendants served plaintiff with a deposition notice on January 11, 2022 for his deposition to be conducted virtually on January 18, 2022. Defendants requested by email that counsel advise defendants immediately if the date and time of the deposition needed to be changed, which plaintiff did not do.

was on trial and unavailable to attend plaintiff's deposition. Mr. Nath did not explain why he was not available to attend the deposition, or why neither attorney had contacted defendants to reschedule the deposition. Mr. Nath also informed defendants, for the first time, that plaintiff was incarcerated in New Jersey, and therefore was also unavailable for his noticed deposition.

Plaintiff has not noticed any depositions in this matter, nor has he requested an extension of time to complete fact discovery. Because fact discovery is set to close today, rather than requesting an extension of discovery for the limited purpose of deposing plaintiff, given the various issues with rescheduling plaintiff's deposition, at this time, defendants propose that they file a fully dispositive motion for summary judgment based on the existing record in this matter. For the reasons discussed below, plaintiff has not, and cannot, adduce any evidence precluding a fully dispositive motion for summary judgment in favor of defendants. Defendants further request that the Court stay the remaining discovery in this matter, which should be limited to the deposition of plaintiff and expert discovery, if any.

B.    Factual Background and Plaintiff's Claims

Plaintiff was arrested on July 26, 2018, after a complaining victim, R.R.,[2] identified plaintiff out of a double-blind photo array as one of the two men who robbed him at gun-point on November 30, 2016. (See Photo Array, attached as Exhibit "B"). Plaintiff has previously given sworn testimony that he does not know who the aforementioned complaining victim is or any information about him, the robbery, his co-defendant in the robbery, or how it came to be that plaintiff was identified as the perpetrator. (See Plaintiff's 50-h Transcript, at 23:15-22; 25:23-25–26:1-2; and 27:6-9, attached as Exhibit "C.") According to plaintiff, on July 26, 2018 police knocked on his apartment door, his wife opened the door, plaintiff then walked to the door, the police asked if he was Glen Carwell, plaintiff responded in the affirmative, and plaintiff was then immediately handcuffed. (See Exhibit "C" at 15:14-25 and 17:16-25 – 18:1-3). Plaintiff also testified that he did not sustain any physical injures beyond his handcuffs allegedly being too tight, which only resulted in his wrists bothering him for a few hours, and for which he never sought medical attention. (See Exhibit "C" at 22:12-25 – 23:1-4).

Plaintiff brings claims pursuant to 42 U.S.C. §1983 and New York State Law for: 1) Unlawful Search and Seizure; 2) False Arrest and False Imprisonment; 3) Excessive Force; 4) Malicious Prosecution; 5) Malicious Abuse of Process; 6) Denial of Right to a Fair Trial; 7) Deprivation of Rights and Denial of Equal Protection of the Laws; 8) Failure to Intervene; 9) Conspiracy to Interfere with Civil Rights and Failure to Prevent Conspiracy; and 10) Municipal Liability. All of these claims fail for the reasons set forth below.

---

[2] For privacy and safety reasons, defendants refer to the complaining victim by his initials.

I.  Plaintiff's False Arrest And Malicious Prosecution Claims Fail Because There Was Probable Cause To Arrest And Prosecute Plaintiff Because He Was Identified By The Victim Out Of A Photo Array.

There was probable cause to arrest and prosecute plaintiff based on complaining victim R.R.'s identification of plaintiff from the double-blind photo array. "A claim for false arrest or false imprisonment fails when the arresting officer had probable cause to make the arrest." Sforza v. City of New York, 2009 U.S. Dist. LEXIS 27358, at *40 (S.D.N.Y. Mar. 31, 2009). Under New York law, the existence of probable cause is also a complete defense to a claim of malicious prosecution. Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). "It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)(citations and internal quotations omitted). The veracity of those individuals "who are the victims of the very crime they report to the police is assumed." Miloslavsky v. AES Engineering Soc., Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992) aff'd 993 F.2d 1534 (2d Cir. 1993.) "A positive photo identification by an eyewitness is normally sufficient to establish probable cause." Celestin v. City of New York, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008); McGrier v. City of New York, et al., 16-CV-5667, Civil Dkt. No. 116, at p. 13 -14, (VEC)(S.D.N.Y. March 2019)("It is well established that '[a] positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest.'" (citing Celestin, 581 F. Supp. 2d 420, 431(E.D.N.Y 2008)(collecting cases)); see also Panetta, 460 F.3d at 395. At a minimum, under these circumstances, the officer would be entitled to qualified immunity. See McGrier, at p. 14, fn. 10; Cerrone v. Brown, 246 F. 3d 194, 202-03 (2d Cir. 2001).

Here, just like in Cerrone and McGrier, the photo array establishes probable cause for plaintiff's arrest and prosecution. The record evidence shows that on June 27, 2018, a complaining victim clearly identified plaintiff out of a photo array as one of the two men who robbed him at gun-point, and the report notes that R.R. signed his name to the photo array and was "absolutely sure" that plaintiff was indeed his robber. (See Exhibit "B.") Furthermore, because plaintiff testified under oath previously that he does not know who the aforementioned complaining victim is or any information about him or the circumstances surrounding his identification, plaintiff cannot refute the veracity of R.R. or argue that the photo array was in any way suggestive or improper (which plaintiff does not even allege.) (See Exhibit "C" at 23:15-22; 25:23-25 – 26:1-2; and 27:6-9.) At the very least, Detective Lozada should be entitled to qualified immunity. Therefore, summary judgment is warranted on plaintiff's false arrest and malicious prosecution claims based on the available record.

II.  Detective Lozada Was Not Present for Plaintiff's Arrest.

It is well-settled in this Circuit that the personal involvement of defendants in a constitutional violation is a prerequisite to an award of damages under § 1983. Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Colon v. Coughlin, 58 F.3d 865,873 (2d Cir.l995). Here, Detective Lozada, the only individually named defendant in this case, was not physically present at plaintiff's apartment on July 26, 2018 when plaintiff was arrested and placed in handcuffs.

Therefore, plaintiff's excessive force and unlawful search and seizure claims fail against Detective Lozada due to lack of personal involvement.[3]

III.   Plaintiff's Unlawful Search And Seizure Claim Further Fails On The Merits.

Where a suspect of a crime is standing directly in the doorway of their residence - such that "one step forward would have put her outside, one step backward would have put her in the vestibule of her residence," they are considered to be "in public" and, thus, a warrant is not required to effectuate a constitutional arrest. See United States v. Santana, 427 U.S. 38, 40 n.1, 42 (1976); see also United States v. 90-23 201st St., 775 F. Supp. 2d 545, 557-61 (E.D.N.Y. 2011). Indeed, police seeking to arrest a suspect without a warrant upon probable cause, while the suspect is standing in the doorway threshold of her residence, do not violate the Fourth Amendment, since such an area is a "public" place in which there is no expectation of privacy; in such case, the suspect is as exposed to the public view, speech, hearing, and touch as if she had been standing completely outside her house, and is therefore not subject to the protection of the Fourth Amendment. See Id. at 427 U.S. 38, 42.

Here, the record shows that the police knocked on plaintiff's apartment door, his wife opened the door, plaintiff then walked to the door, and once he identified himself, plaintiff was immediately arrested in his doorway. (See Exhibit "C" at 15:14-25 and 17:16-25 – 18:1-3). Based on plaintiff's own testimony, the officers did not violate plaintiff's constitutional rights by placing him under arrest without a warrant.

IV.   Plaintiff's Excessive Force Claim Further Fails Because Plaintiff Suffered Only *De Minimus* Injuries.

In making an assessment as to the reasonableness of an officer's use of force, the specific facts and circumstances surrounding the alleged incident must be examined. See Graham v. Connor, 490 U. S. 386, 396(1989). "'Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective[,] handcuffs must be tight enough to prevent the arrestee's hands from slipping out.'" Grant v. City of N.Y., 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007) (quoting Esmont v. City of N.Y., 371 F. Supp. 2d 202, 214 (E.D.N.Y.2005) (citations omitted)). As a matter of law, an "allegation of sore, yet uninjured, wrists [as a result of handcuffing] simply does not rise to the level of objective excess that reasonable police officers would consider to be unlawful conduct in an arrest situation." Wilder v. City of Amityville, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003). Further, Courts have found de minimis injury to be probative of de minimis force. See Washpon v. Parr, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008); Cunninham v. New York City, 04 Civ. 10232 (LBS), 2007 U.S. Dist. LEXIS 69801, at *17 (S.D.N.Y. Sept. 18,

---

[3] Moreover, these claims would fail in their entirety because plaintiff has failed to bring these claims against any individual defendant.  Although he has not sought leave of Court to do so, plaintiff's arrest occurred on July 26, 2018, thus plaintiff is time-barred from adding any additional defendants. Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir. 1997.)  Additionally, the deadline to amend the pleadings in this civil matter was November 17, 2021, and as such, has also long passed. (See Exhibit "A.")

2007) ("numerous courts have held that where plaintiff's injuries are <u>de minimus</u>, the claim of excessive force cannot rise to the level of a constitutional violation as a matter of law.").

Here, plaintiff has previously testified that as a result of his arrest he did not sustain <u>any</u> physical injures beyond his handcuffs allegedly being too tight, which only resulted in his wrists bothering him for a few hours, and for which plaintiff never sought medical attention. (<u>See</u> Exhibit "C" at 22:12-25 – 23:1-4). Plaintiff's lack of injury is further indication of the <u>de minimus</u> force utilized by the officers involved in his physical apprehension related to arrest. <u>See</u> <u>Washpon v. Parr</u>, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008). Therefore, plaintiff's excessive force claim fails as a matter of law. [4]

For the foregoing reasons, the Court should decide defendants' motion for summary judgment at this time and stay the remaining discovery yet to be completed in this case, which is limited to 1) plaintiff's deposition; and 2) expert discovery, if any. Defendants respectfully request that the Court endorse the following proposed briefing schedule in anticipation of defendants' motion for summary judgment:

March 1, 2022 to file defendants' motion;

March 31, 2021 for plaintiff to file his Opposition; and

April 14, 2022 for defendants to file their Reply, if any.

Thank you for your consideration of the matters herein.

Respectfully submitted,

*Morgan C. McKinney, Esq.*
Morgan C. McKinney, Esq.
*Senior Counsel*
Special Federal Litigation Division

cc:   **VIA ECF**
Samuel C. DePaola
*Attorney for Plaintiff*

---

[4] Similarly, plaintiff has not, and will not, be able to adduce any evidence to support his Failure to Intervene, Conspiracy, Equal Protection, Malicious Abuse of Process, Denial of a Right to a Fair Trial, or <u>Monell</u> claims. Additionally, all of plaintiff's state law claims will fail due to plaintiff's untimely notice of claim in this matter. Defendants are prepared to brief each of these issues should the Court grant the instant request.

The pretrial conference will take place as scheduled on **January 28, 2022 at 10:00 a.m.**  The parties should appear for the conference by dialing 888-363-4749, using the access code 3121171 and the security code 0480.

Plaintiff must, by **January 26, 2022,** file his response, if any, to Defendants' proposed actions, including: (1) the stay of remaining discovery pending Defendants' proposed motion for summary judgment; and (2) the proposed briefing schedule for Defendants' motion.

SO ORDERED.

1/21/2022

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE

# Exhibit A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/18/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

# GLEN CARWELL

_____

Plaintiff(s),

21 -CV- 00480 (VEC)

-v-

CIVIL CASE
MANAGEMENT PLAN
AND SCHEDULING
ORDER

CITY OF NEW YORK, ET AL.,

_____

Defendant(s).           :

--------------------------------------------------------X

This Civil Case Management Plan is submitted by the parties in accordance with Fed. R.
Civ. P. 26(f)(3).

1.  All parties [consent _____ / do not consent X_____ ] to conducting all further
    proceedings before a United States Magistrate Judge, including motions and trial.
    28 U.S.C. § 636(c).  The parties are free to withhold consent without adverse substantive
    consequences.  [*If all parties consent, the remaining paragraphs need not be completed.
    In addition, they shall submit to the Court a fully executed Notice, Consent, and
    Reference of a Civil Action to a Magistrate Judge, available at
    https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf, within three days of
    submitting this Proposed Case Management Plan and Scheduling Order.*]

2.  Except for amendments permitted by Fed. R. Civ. P. 15(a)(1) and this Court's Individual
    Practices in Civil Cases ("Individual Practices"), amended pleadings may not be filed and
    additional parties may not be joined except with leave of the Court.  Any motion to
    amend or to join additional parties shall be filed within 30____ days from the date of this
    Order.  [*Absent exceptional circumstances, a date not more than 30 days following the
    initial pretrial conference.*]

3.  Initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) shall be completed no later than
    14____ days from the date of this Order.  [*Absent exceptional circumstances, a date not
    more than 14 days following the initial pretrial conference.*]

4.  [*If applicable*] The plaintiff(s) shall provide HIPAA-compliant medical records release
    authorizations to the defendant(s) no later than November 5, 2021_____.

5.  Discovery

    a.  All fact discovery shall be completed no later than January 20, 2022 _____. [*A
        date not more than 90 days following the initial pretrial conference, unless the Court
        finds that the case presents unique complexities or other exceptional circumstances.*]

    b.  All expert discovery, including reports, production of underlying documents, and
        depositions, shall be completed no later than March 7, 2022 _____. [*Absent
        exceptional circumstances, a date not more than 45 days from the date in paragraph
        5(a) (i.e., the completion of all fact discovery).*]

    c.  Within two weeks of the date of entry of this Scheduling Order, the parties shall meet
        and confer in person to agree upon a joint plan for meeting the discovery deadlines.

    d.  In the case of discovery disputes, the parties should follow Local Civil Rule 37.2 with
        the following modifications: Any party wishing to raise a discovery dispute with the
        Court **must first meet and confer in good faith** with the opposing party, in person,
        or by telephone, in an effort to resolve the dispute. If this process fails and the
        Court's intervention is required, the parties must jointly call Chambers to schedule a
        joint teleconference with the Court for prompt resolution of the dispute. The Court
        will determine during the teleconference whether additional submissions will be
        required.

6.  Counsel for the parties believe the following alternative dispute resolution mechanisms
    may be helpful in resolving this case (check all that apply):

    _____  Immediate referral to the District's Mediation Program

    _____  Immediate referral to a Magistrate Judge

    _____  Referral to the District's Mediation Program after the close of fact
              discovery

    X _____  Referral to a Magistrate Judge after the close of fact discovery

    _____  Other

7.  This case [is X _____ / is not _____ ] to be tried to a jury.

8.  Other issues to be addressed at the Initial Pretrial Conference, including those set forth in
    Fed. R. Civ. P. 26(f)(3), are set forth below.
    Defendants intend on filing a Summary Judgment Motion Pursuant to Federal Rule of Civil
    Procedure 56

9. This Order may not be modified or the dates herein extended except by further Order of the Court for good cause shown. Unless the Court orders otherwise, parties engaged in settlement negotiations must pursue settlement and conduct discovery simultaneously. Parties should not assume that they will receive an extension of an existing deadline if settlement negotiations fail. Any application to modify or extend the dates herein shall be made by written application no later than two business days before the date sought to be extended in accordance with the Court's Individual Practices.

10. The next pretrial conference is scheduled for ~~January 22, 2021~~ January 28, 2022 at 10:00 a.m. in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007. [*Unless otherwise ordered, 10:00 a.m. on the first Friday after the deadline for completion of all fact discovery as set forth in paragraph 5(a).*]

By Thursday of the week prior to that conference, the parties shall submit a joint letter regarding the status of the case. The letter should include the following information in separate paragraphs:

a. a statement of all existing deadlines, due dates, and/or cut-off dates;

b. a brief description of any outstanding motions;

c. a brief description of the status of discovery and of any additional discovery that needs to be completed;

d. a statement describing the status of any settlement discussions and whether the parties would like a settlement conference;

e. a statement of the anticipated length of trial and whether the case is to be tried to a jury;

f. a statement of whether any party anticipates filing a motion for summary judgment or a motion to exclude expert testimony;

g. any other issue that the parties would like to address at the pretrial conference; and

h. any other information that the parties believe may assist the Court in advancing the case to settlement or trial.

Counsel for the Parties:
ACC Morgan McKinney for Defendants
Sameer Nath for Plaintiff

for Sim & Depapa, LLP

SO ORDERED.

Date:   10/18/2021
         New York, New York

VALERIE CAPRONI
United States District Judge

3

# Exhibit B



## PHOTO ARRAY VIEWING REPORT
PD 373-154 (Rev. 09-17)

### PART A - SHOWING THE PHOTO ARRAY

| Witness Name | Administrator | Date |
|---|---|---|
| R | Det. Butler | 6 27 18 |

| Interpreter Used? | ☐ Yes  ☒ No | Name of Interpreter: N/A | Command: N/A | Tax No.: N/A |
|---|---|---|---|---|

If Interpreter is Not a Member of the Service, List Name, Address and Telephone No.

N/A

List any Additional Members of the Service Present:

| Rank/Name | Tax No. | Cmd. | Rank/Name | Tax No. | Cmd. |
|---|---|---|---|---|---|
| n/a | | | | | |

### Instructions to the Administrator Showing the Photo Array:

- Remain neutral. Do not comment on the identification before, during or after the identification procedure.
- Place the photo array in a closed letter-size manila folder when handing it to the witness.
- Stand out of the witness' line of sight, where practical, but still observe the witness as the witness views the photo array.

### PART B - AFTER THE WITNESS HAS VIEWED THE ARRAY, ASK THESE QUESTIONS

Did you recognize anyone in the photo array?     Yes

- If the answer is positive, proceed to the next question.
- If the answer to the preceding question is negative, STOP and go to the signature line.

If so, what is the number of the person that you recognize?     3

From where do you recognize that person?

from my robbery

Record words and gestures of the witness:

If the Witness Gives a Vague Answer     (for example: "I think it is..." or "it might be...")

Then say the following:     You said _____

(insert witness' words, e.g., "I think it is.. ")

What do you mean by that?     (record the witness' answer)

### CONFIDENCE STATEMENT

The following must be read exactly as it appears.

You have just indicated that you have recognized the person in position number . I am going to ask you a question. It is not intended to suggest anything. You should not infer anything from it. I ask this question of every witness at this point. In your own words, not using any numbers or percentages, please tell me how sure you are?

Absolutely sure

Date: 6/27/18     Time: 1705     Witness Signature

### FINAL INSTRUCTION TO WITNESS:

Do not discuss with any other witness what you observed or said during this identification procedure.

| Prepared by Administrator (Rank, Name Printed) | Tax No. | Cmd | Date Prepared |
|---|---|---|---|
| Det. Butler, Sean | 922047 | BXHS | 6/27/18 |

D87



**PHOTO ARRAY PRE-VIEWING INSTRUCTIONS TO WITNESS REPORT**
PD 373-112 (Rev. 09-17)

### CASE INFORMATION AND WITNESS INSTRUCTIONS

| Complaint Report No. | Crime Committed | | Date of Crime |
|---|---|---|---|
| 2016-429-347 | ROBBERY | | 11/30/2016 |

Location of Crime

1285 WASHINGTON AVENUE BRONX N.Y.

| Photo Array Date | Time | Location |
|---|---|---|
| 6/27/18 | 1705 | 830 WASHINGTON AVENUE BRONX NY |

| Witness' Name | | Was Witness Transported |
|---|---|---|
| R | | Yes  [X] No |

| Transporting Officer's Rank/Name | Command | Tax No. |
|---|---|---|
| N/A | N/A | N/A |

| Photo Array Administrator's Rank/Name | Command | Tax No. |
|---|---|---|
| Det. BUTLER, SEAN | BxHS | 922047 |

### READ THE FOLLOWING TO THE WITNESS PRIOR TO SHOWING THE PHOTO ARRAY
IF INVESTIGATOR HAS MADE A DETERMINATION THAT AUDIO RECORDING PRESENTS A SAFETY CONCERN, SKIP THE CONSENT QUESTION BELOW AND GO DIRECTLY TO THE SECOND BULLET

• You are about to view a photo identification procedure. If you consent, NYPD guidelines require that this procedure be audio recorded. Do you consent to the audio recording of this procedure?
    [ ] Yes   [✓] No   Initial _____

• As part of the ongoing investigation into a crime that occurred at 1285 WASHINGTON AVENUE BRONX N.Y. (Location) on 11/30/2016 (Date), you are about to view a photo array.

• It consists of six photographs of individuals. Each photograph has a number underneath the photograph.

• Take whatever time you want to view the photo array.

• The perpetrator may or may not be among the pictures.

• Do not assume that I know who the perpetrator may be.

• Do not ask me or anyone else in the room for guidance during the procedure.

• Individuals presented in the photo array may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.

• Photographs may not always depict the true complexion of a person; it may be lighter or darker than shown in the photo.

• Pay no attention to any markings that may appear on the photos, or any other difference in the type or style of the photographs.

• If you recognize someone, I will ask you to describe how sure you are using your own words, without the use of numbers or percentages. This question is not intended to suggest anything. I ask this question of every witness.

• After you have had an opportunity to view the photo array I will ask you the following three questions:

    1. Do you recognize anyone?    2. If so, what is the number of the person you recognize?

    3. From where do you recognize the person?

    4. Only if you recognize someone, I'm going to ask you to say in your own words how sure you are without using numbers or percentages.

• I may ask you follow-up questions.

• The investigation will continue regardless of whether or not you make an identification.

• Do not discuss with other witnesses what you see, say or do during this procedure.

### WITNESS SIGNATURE:

| The above instructions have been read to me: | | Date: |
|---|---|---|

| Prepared by Administrator (Rank, Name Printed) | Tax No. | Cmd. | Date Prepared |
|---|---|---|---|
| Det. Butler, Sean | 922047 | BXHS | 6/27/18 |

**D88**



# NEW YORK CITY POLICE DEPARTMENT

## Photo Array 417918





| | | |
|---|---|---|
| 1 | 2 | 3 |
| 4 | 5 | 6 |

Identification Made:  ☑ Yes   ☐ No    Photo Selected:  # _3_

Date of Identification Procedure:  _6/27/18_

**D92**

# Exhibit C

1

GLEN CARWELL
2020PI012610
015-220

- - - - - - - - - - - - - - - - - x

In the Matter of the Claim of

GLEN CARWELL,

Claimant,

   -against-

THE CITY OF NEW YORK,

Respondent.

- - - - - - - - - - - - - - - - - x

August 20, 2020
3:23 p.m.

  50(h) HEARING OF GLEN CARWELL,

the Claimant herein, taken by the

attorneys for the Respondent, taken

pursuant to Section 50(h) of the General

Municipal Law, held via web conference at

the above date and time, before Elana

Oved, a Stenotype Reporter and Notary

Public within and for the State of New

York.

2

```
 1   A P P E A R A N C E S :

 2

 3        SIM & DEPAOLA
          Attorneys for Claimant
 4            42-40 Bell Boulevard, Suite 201
              Bayside, New York 11361
 5
          BY:  DAN YAO, ESQ.
 6

 7

 8        PARK & NGUYEN
          Attorneys for Respondent
 9            1809 Paulding Avenue
              Bronx, New York  10462
10
          BY:  DARIN BILLIG, ESQ.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1              THE REPORTER:    Before I swear in

 2        the witness, I will ask counsel to

 3        stipulate on the record that due to the

 4        current national emergency regarding the

 5        coronavirus, the court reporter may swear

 6        in the witness even though she is not

 7        physically in the presence of the witness

 8        and that there is no objection to that at

 9        this time, nor will there be an objection

10        to it at a future date.

11              MR. BILLIG:    No objection.

12              MR. YAO:    No objection.

13              THE REPORTER:    Mr. Yao, can you

14        represent that to the best of your

15        knowledge and belief, the witness

16        appearing today via web conference is, in

17        fact, Glen Carwell?

18              MR. YAO:    Yes.

19         G L E N   C A R W E L L , after having

20    first been duly sworn by a Notary Public of

21    the State of New York, was examined and

22    testified as follows:

23    EXAMINATION BY DARIN BILLIG, ESQ.:

24        Q.    Please state your name for the

25    record.
```

4

1                    GLEN CARWELL

2        A.      Glen Carwell.

3        Q.      What is your present home address?

4        A.      1435 Ogden Avenue, Apartment 4D,

5   Bronx, New York 10452.

6        Q.      Good afternoon, Mr. Carwell.

7        A.      Good afternoon, sir.

8        Q.      My name is Darin Billig.  I am the

9   attorney for The City of New York.  I am going

10  to take your hearing testimony today.

11          Have you ever testified before in

12  your life?

13       A.      At a hearing like this, no.

14       Q.      Okay.  How about at a trial?

15       A.      Not to my knowledge.  I can't

16  recall.

17       Q.      So I am going to ask you a series

18  of questions today about an arrest, the

19  criminal proceedings, and a little bit about

20  your background.  You give answers to these

21  questions to the best of your ability.

22          We have a court reporter on the line

23  with us.  She is recording everything that we

24  say so you have to give a verbal response.  If

25  you nod your head you have to say yes or no at

5

```
 1                    GLEN CARWELL

 2    the same time.  Okay?

 3        A.      Okay.

 4        Q.      Also be patient; let me finish the

 5    question first.  And the most important

 6    instruction is if you do not understand the

 7    question, you are confused in any way, please

 8    let me know.

 9            Is that fair?

10        A.      Absolutely.

11        Q.      Are you taking any medication

12    today for any reason?

13        A.      No.

14        Q.      Do you take any medication on a

15    regular basis that you simply did not take

16    today?

17        A.      No.

18        Q.      What is your date of birth?

19        A.      ███████████

20        Q.      And what is your Social Security

21    number?

22            MR. YAO:    I'm sorry.  Just the

23        last four digits.

24            MR. BILLIG:    Just the birth year

25        on the record.
```

**D11**

6

```
 1                    GLEN CARWELL
 2        Q.    Give me your whole Social Security
 3   number.
 4              MR. YAO:    Mr. Carwell, you can
 5        tell him your whole Social Security and
 6        the date of birth on the record.  We are
 7        going to put the last four digits and the
 8        year.
 9        A.    Not a problem.
10              ▉▉▉▉▉▉▉▉▉▉▉▉▉▉
11        Q.    Are you married?
12        A.    Yes, I am.
13        Q.    What is your spouse's name?
14        A.    Alicia Delgado.
15        Q.    How long have you been married?
16        A.    Four years.
17        Q.    Does your wife work?
18        A.    Yes.
19        Q.    Do you know what type of work she
20   does?
21        A.    Security.
22        Q.    Do you have any children?
23        A.    Yes.
24        Q.    How many children do you have?
25        A.    I have three.
```

**D12**

7

```
 1                    GLEN CARWELL

 2         Q.     How old are they?

 3         A.     Three, one, and nine months.

 4         Q.     Who lives with you at your current

 5   address?

 6         A.     My aunt.

 7         Q.     Your three children live with

 8   their respective mother or mothers?

 9         A.     No.  Yes, they live with their

10   mothers.  They live with their mothers.

11         Q.     Are you required to pay

12   Court-Ordered child support for any of your

13   children?

14         A.     No.

15         Q.     How long have you lived at the

16   Ogden Avenue address?

17         A.     I want to say two years.

18         Q.     Where did you live before that?

19         A.     48 Lincoln Terrace, Yonkers, New

20   York.

21         Q.     That was an apartment building?

22         A.     Yes, Apartment 3.

23         Q.     How long did you live there?

24         A.     About two years.

25         Q.     Do you remember where you lived
```

8

```
 1                  GLEN CARWELL
 2   right before that?
 3        A.    Yes.
 4        Q.    Where was that?
 5        A.    4417 Third Avenue, in the --
 6        Q.    In the Bronx?
 7        A.    Yes.  Bronx, New York.
 8        Q.    How long were you living at that
 9   address?
10        A.    I can't recall how many years.
11        Q.    More than five years?
12        A.    I want to say, I am going to say.
13        Q.    When you lived at Lincoln Terrace,
14   did you live alone or with anyone?
15        A.    I lived with my wife and my kids.
16        Q.    So at the time it was just now the
17   oldest, the three year old, correct?
18        A.    No.  Actually, no.  I think even
19   my little one -- no, it was -- yeah, it was
20   just her at the time, just my three year old
21   at the time.  She was pregnant, I think she
22   was pregnant though, I think.
23        Q.    How tall are you?
24        A.    About five-eleven.
25        Q.    How much do you weigh?
```

9

```
 1                    GLEN CARWELL
 2        A.     150.
 3        Q.     Was that your approximate weight
 4   at the time of your arrest?
 5        A.     No.  I weighed a little more,
 6   yeah.  I was probably around 165.
 7        Q.     Are you employed?
 8        A.     No, not at the moment.
 9        Q.     At the time of this arrest, did
10   you have a job?
11        A.     Yes, I did.
12        Q.     What type of work were you doing
13   at the time of this arrest?
14        A.     Construction.
15        Q.     Do you remember who you were
16   working for?
17        A.     Yes, J&P Construction.
18        Q.     As a result of this arrest, did
19   you miss any time from work?
20        A.     Yes.
21        Q.     How much time did you miss from
22   work?
23        A.     I was laid off.
24        Q.     What was the reason that you were
25   laid off?
```

10

```
 1                    GLEN CARWELL

 2      A.    Because I was incarcerated.

 3      Q.    Have you had a job since that job?

 4      A.    No, I haven't.

 5      Q.    How much were you earning from

 6  J&P Construction?

 7      A.    Actually they was paying me weekly

 8  and they would give me 800 a week.

 9      Q.    Were you being paid in cash off

10  the books?

11      A.    Yes.

12      Q.    What is your highest level of

13  education?

14      A.    Tenth grade.

15      Q.    Do you have health insurance?

16      A.    No, I don't.

17      Q.    Do you receive either Medicare or

18  Medicaid benefits?

19      A.    Yes.

20      Q.    Do you get Medicaid?

21      A.    Yes, Medicaid.  I receive

22  Medicaid.  I apologize.

23      Q.    That is okay.  Have you ever been

24  convicted of a crime?

25      A.    Excuse me?
```

**D16**

11

1                    GLEN CARWELL

2     Q.     Have you ever been --

3              MR. YAO:    I'm sorry, objection.

4     It's not relevant to this conversation.

5              MR. BILLIG:    You are not letting

6     him answer about a criminal conviction on

7     a false arrest claim?

8              MR. YAO:    Not criminal history.

9     Not criminal history.

10             MR. BILLIG:    I didn't ask

11    arrests, just convictions.

12             MR. YAO:    Prior convictions,

13    prior convictions.

14             MR. BILLIG:    I asked him about

15    prior convictions.  Are you letting him

16    answer that question?

17             MR. YAO:    I object to that

18    because it's irrelevant to this

19    proceeding.

20             MR. BILLIG:    Okay.  So this a

21    false arrest claim.  You are not

22    permitting him to answer about prior

23    convictions?

24             Is that what you are telling me?

25             MR. YAO:    Right, right.

**D17**

12

1                    GLEN CARWELL

2            MR. BILLIG:    Okay.

3            MR. YAO:    The reason being the

4      City can, of course, have that.  I

5      believe the City already has that

6      information, so.

7            MR. BILLIG:    Actually the

8      Comptroller's office, who manages the

9      claims, doesn't have that information

10     and, no, they wouldn't have that

11     necessarily until he releases that

12     information.  So at this point they

13     wouldn't have that.

14           MR. YAO:    Understand.  Right.

15     Like I said, it's our position that it's

16     irrelevant to the case being disputed.  I

17     am talking about his prior conviction.

18           MR. BILLIG:    I don't have a

19     judge here so I am not going --

20           As you are well aware convictions

21     are pursuant to the CPLR, are admissible

22     in any civil proceeding.  So they are

23     admissible by State law.  I don't even

24     have to show they are relevant.  The

25     statute permits it, but regardless --

**D18**

13

1                    GLEN CARWELL

2        Q.     Have you ever filed another claim

3    against the City of New York?

4        A.     No.

5        Q.     Have you ever filed a claim

6    against the State of New York?

7        A.     No.

8        Q.     The arrest that we are here to

9    discuss today, what date did it occur?

10       A.     If I'm not mistaken it was July,

11   around July 26, 2018.

12       Q.     On that day were you either on

13   probation or parole?

14       A.     No.

15       Q.     What time of day did you get

16   arrested?

17       A.     I want to say anywhere from

18   between ten and twelve o'clock.

19       Q.     Morning or evening?

20       A.     Morning.

21       Q.     Where did the arrest occur?

22       A.     At 48 Lincoln Terrace, Yonkers,

23   New York, Apartment 3.

24       Q.     That is where you were residing at

25   the time, correct?

14

```
 1                    GLEN CARWELL
 2         A.     Yes, correct.
 3         Q.     Prior to the time of the arrest,
 4    were you aware that NYPD was trying to contact
 5    you?
 6         A.     I would like -- can I ask my
 7    lawyer a question?
 8              MR. YAO:     You can answer that,
 9         yes.  Can you rephrase?
10              MR. BILLIG:     Can you repeat the
11         question again.
12              (Whereupon, the requested portion
13         of the record was read back.)
14         Q.     On July 26th did the police show
15    up at your home?
16         A.     Yes, they did, sir.
17         Q.     Before they showed up that day,
18    did they try to reach out to you in any other
19    way?
20         A.     I mean, not to my knowledge.  No.
21         Q.     Did you know the police were
22    trying to reach out to you before they showed
23    up at your apartment?
24         A.     Did I know the police was looking
25    for me?
```

1                   GLEN CARWELL

2      Q.    Yes.  Did you know the police were

3  looking for you at that point?

4      A.    No, I actually didn't.

5      Q.    So who was home when the police

6  arrived?

7      A.    My wife, her son, and my daughter.

8      Q.    So the daughter was an infant at

9  the time, correct?

10     A.    Correct.

11     Q.    And Alicia's son, how old was he

12  at the time?

13     A.    He was, I would believe, fifteen.

14     Q.    Did the police knock on the front

15  door of the apartment?

16     A.    Yes.

17     Q.    Who went to answer the door?

18     A.    My wife.

19     Q.    Were you able to hear the

20  conversation between your wife and the police

21  at that point?

22     A.    No, not at the beginning.  No.

23     Q.    Did your wife open up the door for

24  the police?

25     A.    Yes.

16

1                    GLEN CARWELL

2        Q.    Did the police come into the

3   apartment?

4        A.    Yes.

5        Q.    How many officers were there?

6        A.    I am not sure how many officers

7   exactly was there.

8        Q.    Approximately?

9        A.    Around the whole house and

10  everything or came in the house?

11       Q.    How many came into the apartment?

12       A.    If I am not mistaken, three, four,

13  five.

14       Q.    Were they in uniforms or

15  plain-clothes?

16       A.    Plain-clothes.

17       Q.    When they came in, did they

18  identify themselves as NYPD?

19       A.    Yes.  They, my wife -- to my

20  knowledge they said they had a warrant and

21  never displayed no warrant.

22       Q.    As you sit here today, did they

23  have a warrant for your arrest?

24       A.    No.  They never presented a

25  warrant at all.

**D22**

17

```
 1                    GLEN CARWELL
 2        Q.     I understand.  In your criminal
 3   case did it ever come up as an issue that they
 4   didn't have the warrant to show you in the
 5   first place to arrest you?
 6        A.     In the beginning, in the
 7   beginning, at my pre, at my arraignment, it
 8   came up at the arraignment about the warrant
 9   and it was never printed.
10        Q.     Did the police eventually present
11   a warrant?
12        A.     No, never.
13        Q.     And the police indicated the
14   warrant was for you, correct?
15        A.     To my knowledge, yes.
16        Q.     What room were you in when you
17   first saw the police?
18        A.     I was right in front of the door.
19   I walked to the door.  I told my wife to open
20   the door for them.
21        Q.     When the police saw you, did they
22   ask you "are you Glen Carwell"?
23        A.     Yes.
24        Q.     What was your response?
25        A.     "Yes, sir."
```

18

1                          GLEN CARWELL

2        Q.      Then what did the police do next?

3        A.      Immediately handcuffed me.

4        Q.      Did you physically resist at all?

5        A.      No.

6        Q.      At that point did they tell you

7    why you were being arrested?

8        A.      No.

9        Q.      Then they escorted you out of the

10   building to a police vehicle, correct?

11       A.      Yes, correct.

12       Q.      From Yonkers where were you

13   brought?

14       A.      To the Bronx, 42nd Precinct.

15       Q.      At the precinct were you

16   questioned at all?

17       A.      No.

18       Q.      At the precinct were you told why

19   you were being arrested?

20       A.      No.  I found out I was being

21   arrested when I got to central booking and I

22   finally seen my lawyer.

23       Q.      I will get to that.  Okay, at the

24   precinct were you brought for a lineup?

25       A.      No.

**D24**

19

```
 1                    GLEN CARWELL

 2        Q.     Do you know the names of any of

 3   the officers involved in the arrest?

 4        A.     No, I don't, sir.

 5        Q.     At the precinct did any of the

 6   officers use physical force on you?

 7        A.     No, they just extremely --

 8   handcuffs were extremely tight.

 9        Q.     About how long did they keep you

10   at the precinct?

11        A.     I am not sure.  Hours, hours.

12        Q.     Sometime later in the day on the

13   26th they brought you to Bronx central

14   booking?

15        A.     Yes, sir.

16        Q.     Did you have to stay overnight at

17   central booking?

18        A.     Yes, sir.

19        Q.     Were you arraigned the next day,

20   the 27th?

21        A.     Yes, sir.

22        Q.     Before seeing the judge for the

23   arraignment, did you have an opportunity to

24   speak to an attorney?

25        A.     Yes.
```

**D25**

20

1                    GLEN CARWELL

2        Q.     Was it a court-appointed attorney?

3        A.     Yes.

4        Q.     Did the court-appointed attorney

5    represent you throughout your criminal case?

6        A.     Yes.

7        Q.     Legal Aid or Bronx Defenders?

8        A.     Bronx Defenders.

9        Q.     What were the charges against you?

10       A.     The charges were -- what was the

11   charges.  I think -- what were the charges.

12             Again, if I'm not mistaken it was

13   robbery, resisting arrest, yeah.  I think

14   robbery and resisting arrest, if I'm not

15   mistaken.

16       Q.     In connection with the alleged

17   robbery, was anyone else arrested?

18       A.     Yes.

19       Q.     Did you have co-defendants?

20       A.     Yes, I had one.

21       Q.     What was the name of your

22   co-defendant?

23       A.     I don't even remember his name,

24   honestly.

25       Q.     Now, was that individual arrested

21

```
 1                    GLEN CARWELL
 2   on a different day than you?
 3        A.    Yes.
 4        Q.    Do you remember who got arrested
 5   first?
 6        A.    No, I really don't.
 7        Q.    But at some point on the court
 8   dates both of you showed up, correct?
 9        A.    No.
10        Q.    All right.  So let's start off,
11   did the judge set bail for you?
12        A.    Yes.
13        Q.    How much?
14        A.    $25,000.
15        Q.    At that point were you able to
16   post the bail?
17        A.    Correct, bond for $2500.
18        Q.    Did they keep you at the
19   courthouse knowing that you were going to post
20   the bail?
21        A.    I did make bail from the
22   courthouse.
23        Q.    When were you released on bail?
24        A.    Sometime at night between seven
25   and nine o'clock.  Yes, between seven and nine
```

**D27**

22

1                    GLEN CARWELL

2    o'clock.

3        Q.     On July 27th?

4        A.     No.  I want to say, I think the

5    28th or the 29th, yes.  It's either the 28th

6    or the 29th or the 27th.  I am not quite sure

7    of the date.

8        Q.     How long were you in custody

9    before you got released on bail?

10       A.     I think two days, a day or two.

11   Not quite sure.

12       Q.     As a result of the arrest and

13   period of custody, did you sustain any

14   physical injury?

15       A.     Just, what is the name like, no,

16   my whole mind frame is just, I am not able to

17   you know, like.

18       Q.     I am going to get to your

19   emotional injuries later.  How about any

20   physical?

21       A.     No, I wasn't in no way besides the

22   handcuffs squeezing my wrists.  That is all.

23       Q.     For the injury to your wrists, did

24   you have to seek any medical treatment?

25       A.     No, I did not.

23

1                    GLEN CARWELL

2        Q.    For how long after the arrest did

3    your wrists bother you?

4        A.    Not long, just for a few hours.

5        Q.    Now, the alleged robbery, when did

6    it allegedly occur?

7        A.    I don't have no clue.

8        Q.    What did you learn, when did it

9    occur?

10        A.    Honestly, I never received any

11   papers, anything.  I was, I don't know, I

12   think 2016 or something, I want to say, like

13   2016.  I am not sure.  I am not sure.

14          2016, 2017.

15        Q.    Do you know who the alleged victim

16   was?

17        A.    I have no clue.

18        Q.    Was it a person who was robbed or

19   a store or --

20        A.    A person supposedly.

21        Q.    What was purportedly stolen?

22        A.    I have no clue.

23          MR. YAO:   Objection.  Please let

24        me talk.  I have a question.  You are

25        asking questions my client has no

24

1                    GLEN CARWELL

2        information about.  He was not involved

3        in the robbery.

4             THE WITNESS:    Exactly.

5             MR. BILLIG:    I am asking whether

6        or not he learned in the criminal case

7        what the allegations are against him.  I

8        am not asking him to admit if they are

9        true or not.

10            THE WITNESS:    They never gave me

11       no papers letting me know anything about

12       the case.  That is what I am trying to

13       tell you.

14            MR. YAO:    Mr. Carwell, please.

15            MR. BILLIG:    After you got

16       arrested, the case lasted for a period of

17       time.  Maybe through conversation with

18       your attorney or something you learned

19       what they were claiming you had done.

20       That is why I am asking.

21            MR. YAO:    I understand.  I am

22       just saying we are asking questions now

23       that he has no information about.

24            MR. BILLIG:    I don't know if he

25       doesn't have any information about it.  I

**D30**

25

1                    GLEN CARWELL

2      am not saying he did it.

3             That is why I am being careful to

4      say "alleged" or "purported."  I am

5      specifically wording it so I didn't

6      implicate that he did anything.

7             THE WITNESS:    I don't have any

8      other record with respect to the arrest.

9      I know nothing.

10            MR. YAO:    Right.

11            MR. BILLIG:    The purpose of this

12      is information gathering and if I get

13      that it's double and triple hearsay, at

14      least it's some information.  It may not

15      be reliable but at least it's something.

16            MR. YAO:    I will let the client

17      answer, but I am just hoping the question

18      is like you said.  Let's phrase it in a

19      way --

20            MR. BILLIG:    I am trying to

21      phrase it -- I am not saying robbery you

22      were involved in.

23      Q.    When did it occur, this purported

24   crime?  Do you know how you got identified?

25      A.    No.  I have no clue how I get

26

1                    GLEN CARWELL

2     identified.

3          Q.     Now, was it alleged that the

4     robbery involved a weapon?

5          A.     Yes, it was.

6          Q.     Was the alleged weapon involved in

7     this alleged robbery a firearm or something

8     else?

9          A.     I don't know.  They just said

10    weapon so I wouldn't have a clue.

11         Q.     Was the case against you presented

12    to a grand jury?

13         A.     No, I didn't go in front of a

14    grand jury.  It was not presented in front of

15    a grand jury.  Oh, wait, excuse me, excuse me.

16         Q.     Did they indict you?

17         A.     Yes, yes.

18         Q.     So a grand jury did indict you?

19         A.     Yes, sir.

20         Q.     Did you testify before the grand

21    jury?

22         A.     No.

23         Q.     Was the co-defendant also

24    indicted?

25         A.     I can't hear you.  I took my head

27

1                    GLEN CARWELL

2    phones out because I don't want my phone to

3    die.  I got to -- hold on.

4         Q.    I hear you.

5         A.    Let me put them back in.

6         Q.    Your co-defendant, was he also

7    indicted?

8         A.    That I am not sure.  I didn't know

9    anything about him.

10        Q.    When you would go to court, to

11   criminal court, was it just you and your

12   attorney and the DA?

13        A.    Yes.

14        Q.    About how many times did you have

15   to go to criminal court?

16        A.    A lot, I can't recall.  I mean, it

17   was about two years, if I'm not mistaken.  Let

18   me see, yes, about a year and a half, two

19   years of court dates, going to court a lot.  I

20   don't know exactly off the, you know.

21        Q.    Was your case ever scheduled for

22   trial?

23        A.    Yes, yes.

24        Q.    Were there ever any type of

25   evidentiary hearings or suppression hearings

**D33**

28

1                    GLEN CARWELL

2    where the officers or someone had to testify?

3         A.    No.

4         Q.    Did the case go to trial?

5         A.    No.

6         Q.    How many times was the case

7    scheduled for trial?

8         A.    I am not a hundred percent sure on

9    how many times it was scheduled for trial.

10        Q.    Was it scheduled more than once?

11        A.    Yes, sir.

12        Q.    On at least one occasion, maybe

13   more, when you appeared for trial, did the DA

14   request an adjournment because they weren't

15   ready for some reason?

16        A.    Yes.

17        Q.    About how many times did that

18   happen where the DA asked for an adjournment

19   where they weren't ready?

20        A.    A lot.  I don't know how many.

21             A lot.

22        Q.    Was it ever scheduled for trial

23   where the judge or the Court said I'm

24   adjourning it because we either don't have a

25   judge or a room for you anyway?

**D34**

29

```
 1                    GLEN CARWELL
 2        A.    No.
 3        Q.    That never happened?
 4        A.    No.  Not to my knowledge, no.
 5        Q.    When was the last time that you
 6   appeared in court for this matter?
 7        A.    I think my case was dismissed on
 8   January 15th.
 9        Q.    Of this year?
10        A.    Yes, of 2020.
11        Q.    Was the case scheduled for trial
12   again on that day?
13        A.    I am not sure.
14        Q.    Now, before you went to court on
15   January 15th, did you know what was going to
16   happen that day?  Had you had an indication
17   through your attorney that the case might get
18   dismissed?
19        A.    I actually, I can't recall.  I
20   can't recall.  Yeah, I can't recall.
21        Q.    Now, what happened when you went
22   to court on January 15th?
23        A.    My lawyer, the judge, they
24   dismissed the charges against me.
25        Q.    Did the DA consent to that
```

**D35**

30

1                    GLEN CARWELL

2   dismissal?

3        A.    I am not sure.

4        Q.    Did they make a motion to drop the

5   charges?

6        A.    Who, the DA?

7        Q.    Yes.  Did they ask to have the

8   charges dropped?

9        A.    I am not sure.  I don't think so.

10  I don't think so.

11       Q.    Did the judge --

12       A.    I don't think so.

13       Q.    Did the judge give a reason why

14  the case was being dismissed?

15       A.    Yes, lack of evidence, things like

16  that.  We have been going to court but I was

17  just going, for what?  The judge, he basically

18  got tired of it, I think, you know.

19            MR. YAO:    Can I interject.

20       Mr. Carwell, if you don't know, say "I

21       don't know."  If you don't remember, say

22       you don't remember.

23       A.    I really don't.  I really don't

24  remember.  These are questions that I don't

25  know.

**D36**

```
 1                   GLEN CARWELL
 2       Q.     How did this whole experience,
 3   getting arrested, having to go to court for
 4   about a year and a half, affect you
 5   psychologically or emotionally?
 6       A.     First off, I lost my family.  That
 7   is first.  My wife, she left me, then didn't
 8   want nothing to do with me anymore.  It scared
 9   her.
10           Me, I still wake up at night, you
11   know, sweating, thinking about it.  I am a
12   little, you know, it frightened me.  I don't
13   know, I always think now seeing police, now
14   they are trying to get me, you know.  I am
15   affected in ways.  I lost my job, I was taking
16   care of my family, providing.  I lost that.
17       Q.     Were any of these issues where you
18   had to seek treatment with a mental health
19   care professional?
20       A.     No, I haven't.
21           MR. BILLIG:    That all I have.
22       Thank you.
23           (Whereupon, the examination of
24       this witness was concluded. Time noted,
25       4:01 p.m.)
```

32

```
 1
 2                A C K N O W L E D G E M E N T
 3
 4         STATE OF NEW YORK   )
 5                            ss
 6         COUNTY OF          )
 7
 8             I, GLEN CARWELL , hereby certify, I
 9         have read the transcript of my testimony
10         taken under oath in my 50(h) Hearing of
11         August 20, 2020; that the transcript is a
12         true, complete and correct record of what
13         was asked, answered and said during this
14         50(h) Hearing, and that the answers on
15         the record as given by me are true and
16         correct.
17
18                             _____
19                                GLEN CARWELL
20
21         Sworn and subscribed to before me
22         on this _____ day of _____ 2020.
23
24         _____
25             NOTARY PUBLIC
```

**D38**

33

```
 1                    C E R T I F I C A T E

 2

 3          I, ELANA OVED, a Shorthand Reporter

 4     and Notary Public within and for the

 5     State of New York, do hereby certify:

 6          THAT GLEN CARWELL, the witness whose

 7     50(h) Hearing is hereinbefore set forth,

 8     was duly sworn by me and that such 50(h)

 9     Hearing is a true record of the testimony

10     given by such witness.

11          I further certify that I am not

12     related to any of the parties to this

13     action by blood or marriage and that I am

14     in no way interested in the outcome of

15     this matter.

16          In witness whereof, I have hereunto

17     set my hand this 2nd day of September, 2020.

18

19

20

21                    ELANA OVED

22

23

24

25
```

**D39**